# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AYE AYE THEIN, *et al.*,

    *Plaintiffs*,

  v.

DONALD J. TRUMP, President of the United States, *et al.*,

    *Defendants*.

Civil Action No. 25-2369 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

  The Plaintiffs in this case are 102 nationals of Afghanistan, Burma, Togo, Somalia, and Iran, who seek to benefit from the diversity visa program provided for in the Immigration and Nationality Act (INA). *See* 8 U.S.C. §§ 1151(e), 1153(c)(1). Fifty-five of the Plaintiffs were selected through the program for the chance to receive fiscal year 2025 visas, and forty-seven are their derivative beneficiaries. The Plaintiffs allege that the Defendants have either failed to adjudicate their diversity visa applications or unlawfully refused them because of a Presidential Proclamation that suspends entry into the United States by individuals from their home countries. And the Plaintiffs face a looming deadline. At midnight on September 30, 2025, their eligibility to receive fiscal year 2025 diversity visas will expire. Accordingly, the Plaintiffs seek a preliminary injunction (1) that directs the Defendants to adjudicate their pending visa applications before September 30, 2025, (2) that prevents the Defendants from refusing their pending applications based on what the Plaintiffs contend is an erroneous interpretation of the INA, and (3) that voids the allegedly unlawful visa refusals some of the Plaintiffs have received based on the Presidential Proclamation. The Court grants in part and denies in part the Plaintiffs' motion.

## BACKGROUND

### A.    The Diversity Visa Program

The INA "creates an annual allotment of immigrant visas" for individuals from countries "with low rates of immigration to the United States." *Goodluck v. Biden*, 104 F.4th 920, 921 (D.C. Cir. 2024). These visas, called "diversity visas," are capped at 55,000 each fiscal year.[1] *See* 8 U.S.C. §§ 1151(e), 1153(c)(1). Eligible applicants enter a "lottery" for that fiscal year's visas. *Gomez v. Trump* (*Gomez I*), 485 F. Supp. 3d 145, 159 (D.D.C. 2020). "Demand regularly outstrips supply," with millions of people applying for the relative handful of available visas. *Id.*

Lottery winners, called "selectees," "are not guaranteed to receive a visa—only the opportunity to apply for one." *Rai v. Biden*, 567 F. Supp. 3d 180, 186 (D.D.C. 2021), *rev'd on other grounds*, *Goodluck*, 104 F.4th 920. Selectees "must submit a full, written application for an immigrant visa and must personally appear for an interview before a consular officer." *Goodluck*, 104 F.4th at 922. And if an applicant meets all the requisite criteria to obtain the visa, "the State Department 'shall' issue him" one. *Almaqrami v. Pompeo*, 933 F.3d 774, 777 (D.C. Cir. 2019) (first citing 8 U.S.C. § 1153(c), (e)(1); then citing 22 C.F.R. §§ 40.6, 42.81(a); and then citing 8 U.S.C. § 1202(h)).

Selection for a diversity visa, however, comes with a strict time limit: selectees are "eligible to receive [the] visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). Thus, selectees must secure their visa by September 30 of the year of their selection, or they lose their eligibility. *Almaqrami*, 933 F.3d at 777. Put another way, "when midnight strikes at the end of the fiscal year, those applicants without visas are out of luck."

---

[1] Although 55,000 diversity visas are available by statute, 5,000 of those visas are reserved for individuals covered by the Nicaraguan Adjustment and Central American Relief Act of 1997, Pub. L. No. 105–100, 111 Stat. 2193 (1997).

*Goodluck*, 104 F.4th at 925 (quoting *Yung-Kai Lu v. Tillerson*, 292 F. Supp. 3d 276, 282 (D.D.C. 2018)).

Selectees who receive a visa "may travel to the United States and seek admission." *Id.* at 922 (citing 8 U.S.C. § 1181(a)). But "[l]ike any other visa, a diversity visa does not guarantee admission." *Id.* It only gives the individual "permission to arrive at a port of entry and have an immigration officer independently examine the alien's eligibility for admission." *Id.* (quoting *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999)). If issued, diversity visas are generally valid for six months after issuance. 8 U.S.C. § 1201(c)(1).

### B.    The Diversity Visa Adjudication Process

The diversity visa program is administered out of the Department of State's Kentucky Consular Center (KCC). *See* 9 Foreign Affairs Manual (FAM) 502.6-4(c)(1)(a); *see also Rai*, 567 F. Supp. 3d at 187 (laying out the diversity visa adjudication process). Selectees must submit a form and supporting documentation to the KCC. *See* 9 FAM 502.6-4(d)(1)(a), (b).

Congress has directed that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). By regulation, such applications are made when the applicant "personally appear[s] before a consular officer and verif[ies]" that the statements in the applicant's paperwork are true, after "having previously submitted all forms and documents . . . and paid the visa application processing fee." 22 C.F.R. § 40.1(*l*)(2). Accordingly, the KCC schedules interviews for diversity-visa selectees. *See* 9 FAM 502.6-4(c)(1). Consular officers are directed that their decision to "issue or refuse an [immigrant visa] application must be based on [that] interview, during which [the consular officer] must ensure that all required documentation has been provided, that there is a legal basis for the applicant to immigrate, and that there are no ineligibilities that would affect visa issuance." 9 FAM 504.1-3(f). By regulation,

"[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6.

"When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, [or] refuse the visa[.]"[2] 22 C.F.R. § 42.81(a). A consular officer cannot "temporarily refuse, suspend, or hold the visa for future action." 9 FAM 504.1-3(g). If the officer refuses the visa, the officer "must inform the applicant of the provisions of law on which the refusal is based." *Id.*

### C.    Proclamation 10949

On January 20, 2025, President Donald J. Trump issued Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 8451 (January 20, 2025). In that executive order, the President directed several officials, including the Secretary of State and the Attorney General, to submit a report identifying countries "for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f))." *Id.* at 8451.

After receiving the report from Secretary of State Marco Rubio and other officials, President Trump issued Proclamation 10949. 90 Fed. Reg. 24497, 24499 (June 4, 2025). Invoking his authority under 8 U.S.C. § 1182(f), the President fully or partially suspended the entry into the United States of individuals from nineteen countries, including Afghanistan, Burma, Togo, Somalia, and Iran. *Id.*

---

[2] The officer may also "discontinue granting the visa" "pursuant to an outstanding order under INA 243(d)," an outcome that is not relevant in this case. 22 C.F.R. § 42.81(a).

On June 6, 2025, after the President issued Proclamation 10949, the Department of State sent implementing guidance to all diplomatic and consular posts worldwide. Admin. R. (AR) CIV010, ECF No. 19. That guidance informed consular officers that they should "first determine whether [an] applicant is otherwise eligible for a visa under the INA, without regard to the [Proclamation.]" AR CIV014. But even if an applicant is otherwise eligible for a visa, if she is "subject to [the Proclamation]" she "must be refused . . . , unless [she] qualifies for one of the [Proclamation's] narrowly defined exceptions." AR CIV010. More specifically, for any applicants from countries subject to the Proclamation, officers "must refuse under INA 212(f)" any applicant not subject to an exception. AR CIV012–CIV013. That guidance accords with the Department's Foreign Affairs Manual, which lists ineligibility for entry under 8 U.S.C. § 1182(f) as a basis for refusing a visa application. 9 FAM 301.4-1(a).

### D.     Factual Background

"The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted." *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 415 (D.D.C. 2020).

The Plaintiffs are fifty-five selectees for the fiscal year 2025 diversity visas (DV-2025) and forty-seven of their derivative beneficiaries. Compl. ¶ 437. Each of them is a national of Afghanistan, Burma, Togo, Somalia, or Iran—countries named in Proclamation 10949. *Id.* The Plaintiffs were informed of their selection for the DV-2025 program in May 2024, and each proceeded through the application process by submitting the necessary forms and paying the requisite fees. *Id.* ¶¶ 439–41.

All of the Plaintiffs attended their DV-2025 interviews with consular officials at their respective embassies. *Id.* ¶ 442. At the conclusion of their interviews, consular officials approved

the applications of eighteen of the Plaintiffs (the Approved Plaintiffs), who were then issued their DV-2025 visas.[3] *Id.* ¶ 443. But for the other eighty-four Plaintiffs (the Non-Approved Plaintiffs), consular officials said that their application "would have to undergo mandatory administrative processing." *Id.* ¶ 444. The Non-Approved Plaintiffs' applications were refused under 8 U.S.C. § 1201(g) and placed in administrative processing. *Id.* When the Non-Approved Plaintiffs checked their visa application status on the Department of State's website, it reported their status as "refused for administrative processing." *Id.* ¶ 447. The website stated that the "case[s] will remain refused while undergoing such processing [and] will receive another adjudication once such processing is complete." *Id.*

Following the issuance of Proclamation 10949, some of the Non-Approved Plaintiffs contacted the relevant U.S. embassy and inquired about the status of their applications. *Id.* ¶ 448. Some of those Plaintiffs received an email informing them that a consular officer had found them "ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to" Proclamation 10949. *Id.* ¶ 449. The Plaintiffs who received this response also had a new visa-application status reflected on the Department of State website: "A U.S. consular officer has adjudicated and refused your visa application. Please see the letter you received at the interview." *Id.* ¶ 450.

---

[3] These are Plaintiffs Parastoo Shoorche, Sarisa Ahmadi, Narjes Heydari, Zaynab Sadat Hassani, Masoumeh Jabbarzadeh, Nina Nejatbakhsh, Fereshteh Farzadfar, and Sara Bozorgmehr. Compl. ¶ 443. Other Approved Plaintiffs, in addition to receiving their DV-2025 visas, also received visas for their derivative-beneficiary children. *Id.* These are Plaintiffs Maryam Almasi Kashi, Golnoosh Ezzatollahzadeh, Akram Radmand HasankiaDeh, Farzaneh Majedi, Pegah Etehad, Maryam Khademi Kohnehshahri, Malihsa Oladi, Somayeh Fahadifoumeshi, Zahra Farnaz Kazemzadeh Marand, and Azamolsadat Seyed Abolhassani Nadaf. *Id.*

E.    **Procedural Background**

The Plaintiffs filed a Complaint in this Court on July 22, 2025, against President Donald J. Trump and Secretary of State Marco Rubio. ECF No. 1. The Complaint alleges that Proclamation 10949 and the Department of State's implementing guidance have resulted in both (1) the unlawful failure to adjudicate some Plaintiffs' DV-2025 applications, and (2) the unlawful refusal of other Plaintiffs' DV-2025 applications. *See* Compl. ¶¶ 503-613. The Complaint seeks a writ of mandamus, an injunction, and relief under the Administrative Procedure Act (APA). *Id.* ¶¶ A–M. On July 31, 2025, the Plaintiffs filed a Motion for Preliminary Injunction. ECF No. 11. The Motion is fully briefed and ripe for review. *See* Defs.' Opp'n, ECF No. 16; Pls.' Reply, ECF No. 20.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain a preliminary injunction, the movant must show that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

A.    **Likelihood of Success**

The Plaintiffs must first show that they are likely to succeed on the merits of their claims. The Court begins with assessing whether the Plaintiffs' claims are justiciable, and then it addresses whether they have shown the requisite likelihood of success on their claims.

### 1.    Justiciability

"The merits on which a plaintiff must show a likelihood of success encompass not only substantive theories but also establishment that the action is justiciable." *Gomez I*, 485 F. Supp. 3d at 169 (cleaned up) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). The Defendants assert that the Plaintiffs cannot meet their burden on justiciability for three reasons: (a) the Plaintiffs lack standing, (b) the Plaintiffs lack a cause of action, and (c) the Plaintiffs' claims are barred by the doctrine of consular non-reviewability. The Court finds both standing and a cause of action at this stage. And although there is likely no obstacle to the Court's review of the claims brought by the Plaintiffs whose applications are undergoing administrative processing, the Plaintiffs whose applications were refused without further processing have not shown a likelihood that their claims can survive the doctrine of consular non-reviewability.

### a.   Standing

"To establish standing, the plaintiff must show (1) it has suffered a 'concrete and particularized' injury (2) that is 'fairly traceable to the challenged action of the defendant' and (3) that is 'likely' to be 'redressed by a favorable decision,' i.e., a decision granting the plaintiff the relief it seeks." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (quoting *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017)). "In the context of a preliminary injunction motion, we require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Id.* at 377 (cleaned up). "Thus, the plaintiff cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken as true, demonstrate a substantial likelihood of standing." *Id.* (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[A] plaintiff must demonstrate standing for each claim he seeks to press

and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quotation marks omitted) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). But "[t]o establish jurisdiction, the court need only find one plaintiff who has standing."[4] *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

The Plaintiffs' Complaint asserts seven causes of action. Compl. ¶¶ 503-613. They seek essentially three forms of relief: (1) an order requiring the Defendants to adjudicate the Plaintiffs' visa applications before September 30, 2025; (2) an order prohibiting the Department of State from denying the Plaintiffs' applications because of Proclamation 10949; and (3) an order voiding the refusals for the Plaintiffs whose visa applications have been adjudicated and denied because of Proclamation 10949. *See* Compl. ¶¶ A–M; Pls.' Mot. for Prelim. Inj. (Mot. for PI) at 43. For purposes of this discussion, the Court will refer to two groups of Plaintiffs: the "Administrative-Processing Plaintiffs," who claim their visa applications have not been adjudicated because they are undergoing administrative processing, and the "Denied Plaintiffs," whose applications have been adjudicated and denied because of Proclamation 10949.[5]

The Defendants contend that the Plaintiffs "have not established their evidentiary burden" to show that they have standing to seek these forms of relief. Defs.' Opp'n at 13. Specifically, the Defendants argue that the Plaintiffs have failed to sufficiently establish injury and redressability. *Id.* at 12–13. The Court addresses each of these arguments in turn.

---

[4] Because the Court concludes that the Non-Approved Plaintiffs have established standing for each claim pressed and each form of relief sought, the Court need not address whether the Approved Plaintiffs have standing.

[5] At oral argument, the Department of State represented that only two individuals fall into the category that the Court is calling the "Denied Plaintiffs," and that there are eighty-two individuals who fall into the category the Court is calling the "Administrative-Processing Plaintiffs." *See* Motions Hr'g (Aug. 15, 2025), Rough Tr. at 9:11–20, 10:2–5. The Plaintiffs did not dispute that representation. *See id.* at 6:14–18.

*First*, injury. The Court concludes that the Plaintiffs have demonstrated a substantial likelihood of injury for each form of relief they seek. The Denied Plaintiffs seek to have their denials voided, and all of the Plaintiffs want to avoid a visa denial because of Proclamation 10949. These claims are grounded "in traditional harms that are obviously concrete:" the "lost professional opportunities, forced separation from family members, and difficulty accessing medical care" that accompany a visa-application denial. *Ranjan v. DHS*, 747 F. Supp. 3d 192, 199 (D.D.C. 2024); *see, e.g.*, Decl. of Aye Aye Thein ¶ 38 (describing separation from her brother); Decl. of Koffi Fabrice Djondo ¶¶ 18–28 (describing effect on educational opportunities); Decl. of Abdiqadir Omar Barre ¶ 13 (describing difficulties accessing required specialized medical treatment); *see also Trump v. Hawaii*, 585 U.S. 667, 698 (2018) ("We agree that a person's interest in being unified with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact."). This is sufficient to establish injury at this stage.[6]

Next, the Administrative-Processing Plaintiffs have satisfactorily shown that they have been injured by the Government's alleged failure to adjudicate their visa applications. These Plaintiffs assert "a procedural injury": the withholding of what they claim to be "statutorily mandated, non-discretionary review and adjudication of [their] visa applications." *Gomez I*, 485 F. Supp. 3d at 171. And "[t]his procedural deprivation is paired with a concrete interest—[the

---

[6] Indeed, the Defendants do not dispute that these Plaintiffs have been injured by their visa-application refusals. They state only that "the law provides no duty to re-adjudicate a visa application after it has been refused." Defs.' Opp'n at 12. Wisely, the Defendants do not couch this argument in terms of standing. As the Supreme Court has explained, issues of jurisdiction such as standing are different than "the legal availability of a certain kind of relief," *see Chafin v. Chafin*, 568 U.S. 165, 174 (2013), which "goes to the merits," *Almaqrami v. Pompeo*, 933 F.3d 774, 780 (D.C. Cir. 2019). So although other justiciability issues—*e.g.*, the doctrine of consular non-reviewability, which the Court discusses below—may ultimately forbid a plaintiff from obtaining relief, these concepts are different than standing. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 n.4 (2024) ("[T]he doctrine of consular nonreviewability is not jurisdictional[.]").

Administrative-Processing Plaintiffs'] interest in obtaining a diversity visa before September 30." *Id.*; *see Food & Water Watch*, 808 F.3d at 921 (explaining that "[d]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009))).

The Defendants contend that the Administrative-Processing Plaintiffs have already received the sought-after adjudication of their visa applications; that their applications have already been adjudicated and refused. Defs.' Opp'n at 12. Thus, the Court encounters one of the central disagreements between the Parties: were these Plaintiffs' applications adjudicated when they were refused for administrative processing under 8 U.S.C. § 1201(g), or have consular officials yet to adjudicate the applications? Although this is an important question that the Court addresses at length below, it need not detain the Court here for long. That is because "[f]or purposes of analyzing plaintiffs' standing," courts assume that the plaintiff "would prevail on the merits of their claim." *Estate of Boyland v. USDA*, 913 F.3d 117, 123 (D.C. Cir. 2019). So here, the Court assumes that consular officials have a nondiscretionary duty to conclude administrative processing and adjudicate the Administrative-Processing Plaintiffs' visa applications. *See Janay v. Blinken*, 743 F. Supp. 3d 96, 107 (D.D.C. 2024) ("For purposes of assessing standing, the Court must 'assume' that Plaintiffs 'will prevail on the merits of their claims unless their arguments that the relief sought is legally available and that [they are] entitled to it is so implausible that it is insufficient to preserve jurisdiction.'" (quoting *Sandpiper Residents Assoc. v. HUD*, 106 F.4th 1134, 1140–41, 1142–44 (D.C. Cir. 2024))).

*Second*, redressability. The Defendants contend that the relief the Plaintiffs seek would not redress their injuries because (1) an order compelling the Defendants to adjudicate the outstanding

visa applications would nevertheless result in a denial under Proclamation 10949; and (2) even if the Plaintiffs received visas, they would not be permitted to enter the United States due to that same Proclamation. Defs.' Opp'n at 13. But these arguments misunderstand the nature of the Plaintiffs' claimed injuries. As discussed above, the Administrative-Processing Plaintiffs raise the "procedural injury" of withheld but statutorily mandated "review and adjudication of [their] visa applications." *See Gomez I*, 485 F. Supp. 3d at 171. That injury is redressed even if the Government denies the Plaintiffs' applications. And if the Denied Plaintiffs get what they ask for, they would have another chance of getting a visa and therefore take a "necessary first step on a path that could ultimately lead to relief fully redressing the injury." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C. Cir. 1994) (quoting *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 273 (D.C. Cir. 1988). Indeed, because diversity visas generally remain valid for six months, if any of the Plaintiffs receive a visa, they will have a six-month window in which the President might rescind or cut back on the restrictions imposed by Proclamation 10949. *See* 8 U.S.C. § 1201(c). No more is required to establish redressability.

In sum, the Plaintiffs have established "a substantial likelihood of standing," which is sufficient to support their motion for a preliminary injunction. *See Elec. Priv. Info. Ctr.*, 878 F.3d at 377.

### b.  Cause of Action

The Defendants recognize that the Plaintiffs have brought APA claims, but they (very) briefly argue that the APA cannot provide the Plaintiffs with a basis for suit. Defs.' Opp'n at 21–22. Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has explained

that "this language establishes a regime under which a plaintiff may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (cleaned up). And the Court has described this "zone of interests" test "as denying a right to review 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 178 (quoting *Clarke v. Secs. Indus. Assn.*, 479 U.S. 388, 399–400 (1987)).

At this stage, the Court sees no obstacle here for the Plaintiffs' APA claims. The Plaintiffs, all visa applicants, have argued that the Defendants have failed to adjudicate their applications as the INA requires, denied their applications in contravention of the INA, or issued guidance contrary to the INA. *See, e.g.*, Mot. for PI at 15, 37; Compl. ¶¶ 519–22. These are exactly the sorts of interests that make the Plaintiffs "expected to police the interests that the statute protects." *See CSL Plasma Inc. v. CBP*, 33 F.4th 584, 589 (D.C. Cir. 2022) (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004)). Nothing more is needed under the zone of interests test. *See id.* And given the Parties' lean briefing on this issue, the Court does not dwell on it further.

### c. Consular Non-reviewability

Finally, the Defendants contend that the Plaintiffs' claims are unreviewable under the doctrine of consular non-reviewability. Defs.' Opp'n at 15–18. That doctrine "holds that a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). "But not every legal challenge that touches on the admission or exclusion of foreign nationals is foreclosed by consular nonreviewability." *Gomez I*, 485 F. Supp. 3d at 176. "[T]he doctrine of consular nonreviewability is not triggered until a consular officer has made a <u>decision</u> with respect

to a particular visa application." *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016). Accordingly, "[d]istrict courts in this jurisdiction consistently have held that when the suit challenges inaction, as opposed to a decision taken within the consul's discretion," the doctrine does not apply. *Gomez I*, 485 F. Supp. 3d at 176 (cleaned up).

Just in describing the doctrine, it is immediately clear that it forbids the relief sought by the Denied Plaintiffs, despite the Plaintiffs' inexplicable protests at oral argument. *See* Motions Hr'g (Aug. 15, 2025), Rough Tr. at 14:5–8, 15:1–5. The Denied Plaintiffs have asked the Court for an order that "set[s] aside . . . any 212(f) refusals given improperly to Plaintiffs." Mot. for PI at 43. Yet review of completed decisions by consular officers is exactly what the doctrine of consular non-reviewability forbids. *See Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) ("Consular nonreviewability shields a consular official's decision to issue or withhold a visa from judicial review[.]"). Thus, even if their claims are otherwise meritorious, the Plaintiffs have not established a likelihood that there is relief the Court can give the Denied Plaintiffs.

The picture is not nearly so clear with respect to the Administrative-Processing Plaintiffs. Recall the basic debate between the Parties about the status of these Plaintiffs' applications: were their applications adjudicated when they were refused for administrative processing under 8 U.S.C. § 1201(g), or do consular officials still need to adjudicate them? That question is important because if the Plaintiffs' applications have been adjudicated and the Plaintiffs seek to challenge that adjudication, the doctrine of consular non-reviewability forbids review; if not, then the Court can reach the merits.

This Court is far from the first in this District to address this question. For nearly a decade, the overwhelming consensus view has been that a refusal for administrative processing does not mean that a visa candidate's application has been adjudicated. *See, e.g.*, *Janay*, 743 F. Supp. 3d at 112 (concluding that "the factual allegations of the complaint . . . provide a plausible basis to conclude that the consular officer has yet to decide whether to grant or to deny" an application that was refused for administrative processing); *Augustin v. Blinken*, No. 23-cv-76, 2023 WL 4547993, at *3 (D.D.C. July 14, 2023) ("Cases in administrative processing have not been finally refused and are therefore subject to judicial review for undue delay." (cleaned up)); *Carter v. DHS*, No. 21-cv-422, 2021 WL 6062655, at *3 n.3 (D.D.C. Dec. 22, 2021) ("[R]efusals followed by 'administrative processing' are not 'final decisions[.]'"); *Nine Iraqi Allies*, 168 F. Supp. 3d at 284 ("'Administrative processing' is not an opportunity for reconsideration of a decision but is a pre-requisite to reaching the decision itself[.]"); *see also Ibrahim v. Dep't of State*, No. 19-cv-610, 2020 WL 1703892, at *5 (D.D.C. Apr. 8, 2020) (joining the consensus view that "where the application is still undergoing administrative processing, even where a refusal has been relayed, the decision is not final" and citing cases from other districts).[7] *But see Yaghoubnezhad v. Stufft*,

---

[7] *See also, e.g.*, *Khan v. Blome*, No. 22-cv-2422, 2022 WL 17262219, at *2 (D.D.C. Nov. 29, 2022) (acknowledging that applications "mired in administrative processing" had not received a final decision by a consular officer); *Al-Gharawy v. DHS*, 617 F. Supp. 3d 1, 16 (D.D.C. 2022) (concluding that a complaint alleging the plaintiffs' applications had been refused for administrative processing "indicate[d] that no final decision has been made with respect to [their] visa applications"); *Ramirez v. Blinken*, 594 F. Supp. 3d 76, 87 (D.D.C. 2022) ("[C]ourts have found that such refusals for further 'administrative processing' do not constitute a final adjudication of the visa application."); *Kinsley v. Blinken*, No. 21-cv-962, 2021 WL 4551907, at *7 (D.D.C. Oct. 5, 2021) (describing a refusal for administrative processing as "a form of interim refusal of a visa while the [President's] Proclamations remain in effect"); *Joorabi v. Pompeo*, 464 F. Supp. 3d 93, 100 (D.D.C. 2020) (explaining that "administrative processing" means "that no final decision has been made"); *Vulupala v. Barr*, 438 F. Supp. 3d 93, 99 (D.D.C. 2020) (concluding that no "'final' decision ha[d] already been made" on an application in administrative processing). The Court could cite more cases.

734 F. Supp. 3d 87, 104 (D.D.C. 2024) (treating a refusal for administrative processing as a "definitive action" that was effectively "a dispositive adjudication"); *Sedaghatdoust v. Blinken*, 735 F. Supp. 3d 1, 7 (D.D.C. 2024) (same).

The Defendants, however, contend that this overwhelming consensus was in fact a "debate" about how to treat administrative-processing cases—a debate that was "ended" by the D.C. Circuit's unpublished opinion in *Karimova v. Abate*, No. 23-cv-5178, 2024 WL 3517852 (D.C. Cir. July 24, 2024). Defs.' Opp'n at 17. The Court disagrees.

In *Karimova*, the D.C. Circuit considered APA claims brought by a visa applicant whose application had been refused for administrative processing. 2024 WL 3517852, at *2. In the court's words, a consular officer "reviewed Karimova's application and interviewed her," "officially 'refused' her application," and then "placed her application in administrative processing in order to verify qualifications for her requested visa." *Id.* (cleaned up). Thus, rather than being a waystation before the adjudication, the court's view was that a refusal for administrative processing constitutes "an official decision refusing to issue a visa because the applicant has not carried her burden of showing eligibility." *Id.* The ongoing nature of that processing meant only that "the officer can determine *sua sponte* that the administrative processing is 'completed' and may then re-open and re-adjudicate the applicant's case." *Id.*

Far from "end[ing the] debate," Defs.' Opp'n at 17, *Karimova* has spawned a great deal of confusion. For one, "courts in this district are split on whether unpublished circuit decisions like *Karimova* are binding"—and indeed, whether *Karimova* specifically is binding. *Seifan v. Sweeney*, No. 25-cv-261, 2025 WL 2171093, at *3 (D.D.C. July 31, 2025) (laying out cases on each side of the split). And courts have also expressed that *Karimova* "leaves uncertain the case law in this District rejecting application of the consular nonreviewability doctrine where, as here, a plaintiff's

application has been 'refused' but simultaneously—and confusingly—still subject to further administrative processing." *Mahmoodi v. Altman-Winans*, No. 24-cv-2010, 2025 WL 763754, at *5 (D.D.C. Mar. 11, 2025); *see also Sereshti v Gaudiosi*, No. 24-cv-1288, 2024 WL 4625802, at *5 (D.D.C. Oct. 30, 2024).

This Court has previously weighed in on the side that *Karimova* is both not binding and not significantly persuasive.[8] *Motevali v. Rubio*, No. 24-cv-1029, 2025 WL 885116, at *6 & n.4 (D.D.C. Mar. 21, 2025); *see also Hajizadeh v. Blinken*, No. 23-1766, 2024 WL 3638336, at *3 n.3 (D.D.C. Aug. 2, 2024) (AliKhan, J.) (similar). The Court finds much more persuasive the analysis by Judge Randolph Moss in *Janay v. Blinken*. Judge Moss observed that "the State Department cannot elevate form over substance, and, instead, the inquiry must focus on what is actually happening." 743 F. Supp. 3d at 112 (cleaned up) (quoting *Al-Gharawy*, 617 F. Supp. 3d at 16). Judge Moss reasoned:

> By analogy, an agency cannot avoid judicial review by, for example, characterizing a final, operative decision as interlocutory and pending further review, someday. By the same token, the State Department cannot evade its obligation (if any) to adjudicate visa applications in a timely manner by characterizing every long-pending application as "refused," even when the consular officer is still "administratively processing" and considering whether to grant the application.

*Id.* Thus, the word "'refused' is not a 'get-out-of-review-free card' that, regardless of substance, satisfies the consular officer's duty (if any) to render a timely decision on the application." *Id.* (quoting *Al-Gharawy*, 617 F. Supp. 3d at 16).

---

[8] At oral argument, the Defendants suggested that *Karimova* binds this Court. Motions Hr'g (Aug. 15, 2025), Rough Tr. at 33:14–24. But a D.C. Circuit panel's "decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition." D.C. Cir. R. 36(e)(2); *see also Doroodchi v. Rubio*, No. 24-cv-3170, 2025 WL 1865114, at *3 (D.D.C. July 7, 2025) (rejecting the proposition that unpublished D.C. Circuit decisions like *Karimova* are binding on courts in this District).

To put a finer point on it, consider another analogy. Imagine that a driver applies for a parking permit; the driver fills out all the necessary paperwork, pays a fee, and arrives at a Department of Motor Vehicles office. The driver submits her application to the DMV clerk and asks to get the permit. The clerk looks over the application and determines that everything seems to be in order, but he says that he cannot give her the permit until he checks whether the DMV has any permits left. He tells the driver that the computer system is running slowly, so she should leave for the day and that he will call her once he has seen whether there is a permit he can give her. But a month passes, and the clerk has not called the driver about whether there is a permit for her. Has the clerk made a decision about the driver's application? In one sense, yes: the clerk has made *a* decision that he could not yet give her the permit and that he needed to see whether he can give her one. But in the relevant sense, the clerk has not made *the* decision about the application. The driver has not gotten a yes-or-no determination from the clerk that puts her application to rest.

The import of this analogy should be obvious. When a consular officer decides to refuse a visa-applicant's application for administrative processing, the officer has certainly made *a* decision about the application: that the applicant should not yet receive the visa and that more processing is required. And if that were the decision that the Administrative-Processing Plaintiffs were challenging here, the Court has no doubt that decision would be shielded by the doctrine of consular non-reviewability. But the Administrative-Processing Plaintiffs are challenging something different: that the Department of State has not yet made *the* decision about their applications—the determination that puts their applications to rest.[9] So although it is true that the Administrative-Processing Plaintiffs, like the driver, walked out of their respective appointments

---

[9] Indeed, the absence of the Department of State having settled the application is what distinguishes applications in administrative processing from applications that have been adjudicated but which may be reconsidered upon request of the applicant. *See* 22 C.F.R. § 42.81(e).

with *a* decision about their application, they, like the driver, never received *the* all-important yes-or-no decision from the reviewing officer about the benefit they sought to obtain.

With all respect to the *Karimova* panel, it failed to appreciate this aspect of "what is actually happening." *Janay*, 743 F. Supp. 3d at 112 (quoting *Al-Gharawy*, 617 F. Supp. 3d at 16). *Karimova* was certainly correct that an administrative-processing refusal is "an official decision refusing to issue a visa." 2024 WL 3517852, at *2. But the evidence before the Court supports the conclusion that such decisions are different from the decision "whether to grant or to deny" the application. *Janay*, 743 F. Supp. 3d at 112. The Department of State's online case status report tells the Administrative-Processing Plaintiffs: "If you were informed by the consular officer that your case was refused for administrative processing, your case will remain refused *while undergoing such processing*. You *will* receive another adjudication once such processing is complete." Compl. Ex. D (emphases added). "In other words, the application is still being processed and a decision is still forthcoming. It has only been 'refused' in the far-from-literal sense that it has not yet been 'granted' or 'denied.'" *Janay*, 743 F. Supp. 3d at 112. The Administrative-Processing Plaintiffs claim that the Department of State has unlawfully failed to make that yes-or-no determination. Assuming that consular officers have a duty to make such a determination, the Plaintiffs' challenge is therefore to "inaction, as opposed to a decision taken within the consul's discretion," and the Court concludes that the doctrine of consular non-reviewability likely does not apply.[10] *Gomez I*, 485 F. Supp. 3d at 176 (cleaned up).

---

[10] Similarly, because the Plaintiffs' challenge to the Department of State's guidance regarding Proclamation 10949 also does not challenge "an affirmative visa 'determination,'" the doctrine of consular non-reviewability likely does not foreclose review of that claim either. *See Gomez I*, 485 F. Supp. 3d 145, 159 (D.D.C. 2020).

*    *    *

In sum, although the Plaintiffs have sufficiently established that they have standing and a cause of action, the Denied Plaintiffs have not shown that their claims will survive the doctrine of consular non-reviewability. The Administrative-Processing Plaintiffs, on the other hand, have brought claims that this Court likely can review. Accordingly, the Court turns next to whether these Plaintiffs have shown that they are likely to succeed on the merits of their claims.

### 2.    The Administrative-Processing Plaintiffs' Claims

The claims that the Court may consider are twofold: (a) that the Department of State's adjudication of the Plaintiffs' applications has been "unlawfully withheld" and "unreasonably delayed," 5 U.S.C. § 706(1); and (b) that the Department's guidance implementing Proclamation 10949 is "not in accordance with law," *id.* § 706(2)(A). The Court addresses each in turn.

### a.    Withholding and Unreasonable Delay

First, the Plaintiffs contend that the Defendants[11] have failed to discharge their statutory duty to adjudicate their DV-2025 applications within a reasonable time. Mot. for PI at 15. That failure, the Plaintiffs contend, compels APA relief under 5 U.S.C. § 706(1) and mandamus under 28 U.S.C. § 1361. Mot. for PI at 16, 20. "The standards for reviewing agency inaction—including visa processing delays—are the same under the APA and Mandamus Act, so the Court will address both claims together." *Doroodchi v. Rubio*, No. 24-cv-3170, 2025 WL 1865114, at *2 (D.D.C. July 7, 2025) (cleaned up) (quoting *Akrayi v. U.S. Dep't of State*, No. 22-cv-1289, 2023 WL 2424600, at *2 (D.D.C. Mar. 9, 2023)). At the threshold of such claims, the "Plaintiffs must first

---

[11] Because "the President is not an agency within the meaning of the [APA]," the Court excludes the President when it uses the term "Defendants" for the purpose of discussing the Plaintiffs' APA claims. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

allege that the agency 'failed to take a discrete agency action that it is required to take.'" *Da Costa v. Immigr. Investor Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)). If the Plaintiffs make it past that threshold, then the Court must analyze "the six factors identified in *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70, 79–80 (D.C. Cir. 1984)," to determine whether the Plaintiffs are likely to prevail on their 5 U.S.C. § 706(1) and mandamus claims. *Rai*, 567 F. Supp. 3d at 196. The Court first (i) discusses whether the Plaintiffs have shown the threshold nondiscretionary duty, and then (ii) analyzes the *TRAC* factors.

### i.    Nondiscretionary Duty

The Plaintiffs principally locate a nondiscretionary duty in 8 U.S.C. § 1202(b), which states: "All immigrant visa applications shall be reviewed and adjudicated by a consular officer." Mot. for PI at 17, 20. The Plaintiffs cite cases relying on Section 1202(b) to conclude that consular officers have a nondiscretionary duty to "review and adjudicate immigrant visa applications." *E.g.*, *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 235 (D.D.C. Sept. 9, 2021) (quoting *Gomez v. Biden* (*Gomez III*), No. 20-cv-1419, 2021 WL 3663535, at *14 (D.D.C. Aug. 17, 2021)), *rev'd on other grounds*, *Goodluck*, 104 F.4th 920; Mot. for PI at 20. And the Plaintiffs further rely on 5 U.S.C. § 555(b), which provides that agencies shall "proceed to conclude a matter presented to it" "within a reasonable time." Mot. for PI at 19.

The Court agrees that 8 U.S.C. § 1202(b) confers on consular officers a nondiscretionary duty to review and adjudicate immigrant visa applications. The D.C. Circuit's opinion in *Meina Xie v. Kerry* is instructive on this point. 780 F.3d 405 (D.C. Cir. 2015). In *Meina Xie*, a noncitizen applied for a so-called category EB–3 visa. *Id.* at 406. Her visa application had been pending for over eight years, which she said was attributable to the Department of State's policy of processing

her subcategory of visa less quickly than others. *Id.* at 407. She challenged that policy as contrary to 8 U.S.C. § 1153(e)(1), which states: "Immigrant visas made available under subsection (a) or (b) of this section shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General." *Id.* at 405–06. The D.C. Circuit held that Section 1153(e)(1) sufficiently embodied a nondiscretionary duty to support a 5 U.S.C. § 706(1) claim. *See id.* at 408; *see also Da Costa*, 80 F.4th at 340 (acknowledging that holding). That was because the noncitizen could point "to a precise section of the INA, establishing a specific principle of temporal priority that clearly reins in the agency's discretion, and [she] argues that the disparate cut-off dates for various subcategories manifest a violation of the principle." *Meina Xie*, 780 F.3d at 408.

Section 1202(b) creates a similar nondiscretionary duty. Section 1202(b) directs: "*All* immigrant visa applications *shall* be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b) (emphases added). That is a "precise section of the INA" that establishes a "specific principle" of comprehensive review and adjudication by consular officers.[12] *See Meina Xie*, 780 F.3d at 408. And the Plaintiffs here argue that the Defendants' failure to adjudicate their applications "manifest a violation of the principle." *Id.* For that reason, several of the courts in this District to have considered the question have held that failure-to-adjudicate-visa claims meet the nondiscretionary-duty threshold of 5 U.S.C. § 706(1). *See, e.g.*, *Rai*, 567 F. Supp. 3d at 195; *Filazapovich*, 560 F. Supp. 3d at 235; *Gomez I*, 485 F. Supp. 3d at 198 n.23.

---

[12] 22 C.F.R. § 40.1(*l*) explains that immigrant visa applications are made at the time of the interview with a consular officer, so the duty to adjudicate only arises at that point. The Court does not understand 8 U.S.C. § 1202(b) to require adjudication of all submissions that do not culminate in an application at an interview.

The Defendants, arguing that they lack a duty to adjudicate any of the Plaintiffs' applications, rely again on the D.C. Circuit's decision in *Karimova*. Defs.' Opp'n at 31–32. Given the Court's extensive discussion of *Karimova* above, suffice it to say that the Court disagrees with the Defendants that "*Karimova* is dispositive of the claims presented in this case." Defs.' Opp'n at 34. Still, two final points on *Karimova* are worth discussing. First, the *Karimova* court itself recognized that its analysis hinged on the applicant there invoking only 5 U.S.C. § 555(b), a provision that the court described as merely expressing "general, good-governance principles." 2024 WL 3517852, at *3–*4. Accordingly, the *Karimova* court did not address the "special provision of the immigration code" invoked in *Meina Xie* and *Da Costa*, nor did it consider whether any provision other than Section 555(b) created a nondiscretionary duty that could support a Section 706(1) claim. *Id.* at *6. Second, the *Karimova* court framed the relevant question as whether consular officers had a duty, after refusing an application for administrative processing, to terminate that processing. *See id.* at *4. The court reasoned that Section 555(b) "*at most* could have entitled [the applicant] to the official refusal decision she already received." *Id.* But, as discussed above, this conflates the administrative-processing refusal with a yes-or-no adjudication of the application. Here, the Plaintiffs have sufficiently shown that only the latter satisfies Section 1202(b) and that the Defendants have not yet discharged that nondiscretionary duty.

## ii.    The *TRAC* Factors

Having concluded that the Plaintiffs are likely to show that the Defendants had a nondiscretionary duty to adjudicate their visa applications, the Court turns next to the *TRAC* factors. As mentioned, these factors govern claims under 5 U.S.C. § 706(1). *Rai*, 567 F. Supp. 3d at 196. The factors are:

(1) The time agencies take to make decisions must be governed by a rule of reason;
(2) where Congress has provided a timetable or other indication of the speed with

> which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities or a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836–37 (D.C. Cir. 2012) (per curiam) (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999)). Although "*TRAC* set forth this framework to assess whether agency delays are 'so egregious as to warrant mandamus' under the All Writs Act," the D.C. Circuit has "routinely applied the same framework to assess claims that agency action has been 'unreasonably delayed' for purposes of the Administrative Procedure Act." *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 815 (D.C. Cir. 2024) (first quoting *TRAC*, 750 F.2d at 75, 79–80; and then quoting 5 U.S.C. § 706(1)). Applying these factors, the Court agrees with the Plaintiffs that they are likely to prevail on their unreasonable delay claim.

*Factors one and two*: "The first two *TRAC* factors focus on the extent of and reasons for the agency delay." *Afghan & Iraqi Allies*, 103 F.4th at 816. The first factor, which is "the most important consideration under *TRAC*," is that "the time agencies take to make decisions must be governed by a rule of reason." *Id.* (quotation marks omitted) (first quoting *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008); and then quoting *TRAC*, 750 F.2d at 80). The second factor "gives content to the first": "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason." *Id.* (first quoting *United Mine Workers*, 190 F.3d at 549; and then quoting *TRAC*, 750 F.2d at 80).

These factors weigh in the Plaintiffs' favor. As courts in this District have explained, "[t]he INA provides a clear indication of the speed with which it expects the agency to proceed in processing diversity lottery selectees['] visa applications." *Rai*, 567 F. Supp. 3d at 196 (quotation marks omitted) (quoting *Gomez I*, 485 F. Supp. 3d at 196). Under 8 U.S.C. § 1154(a)(1)(I)(ii)(II), diversity-visa selectees are eligible to receive their visa "only through the end of the specific fiscal year for which they were selected." The rigidity of this deadline, as well as its "specificity and relative brevity," reflects "Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline." *Gomez I*, 485 F. Supp. 3d at 196 (quoting *People's Mojahedin Org. of Iran*, 680 F.3d at 837).

The Defendants observe that the delays suffered by the Plaintiffs have been (by visa-application standards) short—the shortest being a couple months and none being more than a year. Defs.' Opp'n at 36. This Court has previously acknowledged that "[c]ourts in this District label delays 'between three to five years' as reasonable and generally extend the 'unreasonable' label to delays more than five years." *Motevali*, 2025 WL 885116, at *7 (quoting *Ahmed v. Blinken*, 759 F. Supp. 3d 1, 12 (D.D.C. 2024)). But this case is unlike those cases. Because of the strict deadline Congress imposed on issuance of diversity visas, "when midnight strikes at the end of the fiscal year, those applicants without visas are out of luck." *Goodluck*, 104 F.4th at 925 (quoting *Yung-Kai Lu v. Tillerson*, 292 F. Supp. 3d 276, 282 (D.D.C. 2018)). This Court joins other courts in this District that have concluded the first two *TRAC* factors favor diversity-visa applicants whose applications are stuck in administrative processing when the statutory deadline is impending. *See, e.g.*, *Rai*, 567 F. Supp. 3d at 196–97; *Filazapovich*, 560 F. Supp. 3d at 236–37; *Gomez I*, 485 F. Supp. 3d at 196.

*Factors three and five*: These factors "focus on the interests affected by agency delay." *Afghan & Iraqi Allies*, 103 F.4th at 817. The third factor observes that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *Id.* at 818 (quoting *TRAC*, 750 F.2d at 80). And the fifth factor addresses "the nature and extent of the interests prejudiced by the delay." *Id.* (quoting *TRAC*, 750 F.2d at 80).

These factors doubtlessly favor the Plaintiffs. "The prejudice from delay is dire—DV-20[25] applicants might permanently lose their opportunity to immigrate to the United States" and escape what many of the Plaintiffs have described as difficult or dangerous circumstances. *Gomez I*, 485 F. Supp. 3d at 196; *e.g.*, Decl. of Abdiqadir Omar Barre ¶ 15 (expressing safety fears due to Somalia's "unstable" security situation); Decl. of Mohammadsadeg Sadaghian ¶¶ 11–12 (describing a lack of access to water and electricity and the fear of compulsory military service); Decl. of Seyed Hossein Hadaeghi at ¶ 16 (stating that he "fear[s] for [his] safety constantly" in Iran); Decl. of Seyed Sina Mousavi ¶ 13 (describing the "oppressive" political environment in Iran). The Defendants contend that these factors favor them because granting relief to the Plaintiffs would "simply benefit Plaintiffs to the detriment of other" applicants who are awaiting adjudication. Defs.' Opp'n at 39. But this argument is "better suited to the fourth factor, and indeed [is] essentially a reprise of Defendants' argument[] on that factor." *Filazapovich*, 560 F. Supp. 3d at 237.

*Factor four*: The fourth factor "addresses 'the effect of expediting delayed action on agency activities of a higher or competing priority.'" *Afghan & Iraqi Allies*, 103 F.4th at 819–20 (quoting *TRAC*, 750 F.2d at 80). This factor is important, as the D.C. Circuit has "refused to grant relief, even though all the other factors considered in *TRAC* favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no

net gain." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (cleaned up). The Defendants contend that this is such a case because granting relief would "prioritize Plaintiffs' visa applications ahead of others." Defs.' Opp'n at 38.

But at this stage, the Defendants' contention is little more than an unsupported assertion. For this to be a situation of net-zero gain, it would have to be the case that for every Plaintiff's application the Department of State adjudicates, another DV-2025 application would go unadjudicated by the September 30 deadline. Nothing in the record currently before the Court indicates that is the reality. But of course, this is a question of fact, and the Court is limited to the thin record before it in this preliminary posture. If the Defendants adduce evidence that supports that this is a zero-sum situation, the Court will take that evidence into account as this case progresses. But for now, the Court determines that the fourth factor is neutral.

*Sixth factor*: The final *TRAC* factor "notes that 'the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'" *Afghan & Iraqi Allies*, 103 F.4th at 820 (quoting *TRAC*, 750 F.2d at 80). The Plaintiffs contend that there is such impropriety, suggesting the Department of State purposely delayed adjudicating the Plaintiffs' applications until Proclamation 10949 came into effect. Mot. for PI at 26–27. The Court disagrees. There is nothing currently in the record that supports the Plaintiffs' supposition. But in any case, "[t]he court 'need not' make any such finding to find unreasonable delay . . . and so it declines to do so here." *Gomez I*, 485 F. Supp. 3d at 197 (quoting *TRAC*, 750 F.2d at 80).

*Balancing the TRAC factors*: Given the impending drop-dead date for the DV-2025 visas and the very high stakes for the Plaintiffs, the *TRAC* factors tip in their favor. And because the Court has not seen evidence supporting the Defendants' contention that adjudicating the Plaintiffs' applications will result in the inability to adjudicate other applications prior to the September 30

deadline, the fourth factor does not usurp the others. Accordingly, weighing all the *TRAC* factors together, the Court concludes that the Plaintiffs are likely to succeed on the merits of their 5 U.S.C. § 706(1) claims.[13]

### b. Proclamation 10949 and the Department of State's Guidance

Next, the Plaintiffs attack Proclamation 10949 as unconstitutional, and the Department of State's implementing guidance as unlawful under the APA. *See* Mot. for PI at 28–37; Compl. ¶¶ 512-23. The Court concludes that the Plaintiffs are likely to prevail on their APA claims.[14]

After the President promulgated Proclamation 10949, the Department of State issued guidance directing consular officers to refuse visa applications from applicants subject to the Proclamation. *See* AR CIV010–CIV014. The basis for that directive, the guidance said, was 8 U.S.C. § 1182(f). *Id.* That provision states:

---

[13] Because "relief under the Mandamus Act is only warranted when 'there is no other adequate remedy available to the plaintiff,'" the Court concludes that, having shown a likelihood of success on their 5 U.S.C. § 706(1) claim, the Plaintiffs are unlikely to succeed on their claim for mandamus. *See Gomez I*, 485 F. Supp. 3d at 198 (quoting *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)).

[14] The Plaintiffs are not likely to succeed on their constitutional claims. They contend that Proclamation 10949 is unconstitutional because 8 U.S.C. § 1182(f) is itself unconstitutional under the non-delegation doctrine and the separation of powers. Mot. for PI at 28–31. But those arguments are borderline frivolous in light of *Trump v. Hawaii*, 585 U.S. 667 (2018). There, the Supreme Court described the "textual limits" that Subsection 1182(f) places on the President, *id.* at 687–88, and those limits are sufficient to survive the "intelligible principle" test the Court has prescribed to assess delegations, *see Gomez I*, 485 F. Supp. 3d at 186–87. And the separation of powers doctrine is an awkward fit for the Plaintiffs' claims for the simple reason that the President issued Proclamation 10949 pursuant to an act of Congress. *See Freytag v. Comm'r*, 501 U.S. 868, 878 (1991) ("Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch."); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum[.]"). When pressed at oral argument, the Plaintiffs urged the Court to disregard *Trump v. Hawaii* because it was wrongly decided. Motions Hr'g (Aug. 15, 2025), Rough Tr. at 19:8–16. For obvious reasons, the Court will not ignore binding Supreme Court precedent.

> Whenever the President finds that the entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). The Plaintiffs contend, however, that Subsection 1182(f) does not empower consular officers "to deny the responsibility delegated to them by Congress to review, adjudicate, and issue diversity visas." Mot. for PI at 37; Compl. ¶¶ 519–22 (similar). Thus, the Plaintiffs argue that the Court must recognize the unlawfulness of the Department of State's guidance under a bevy of different APA theories—as arbitrary and capricious, not in accordance with law, and in excess of statutory authority. *See* Mot. for PI at 37; Compl. ¶¶ 523, 530, 544. The APA directs courts reviewing agency action to "hold unlawful and set aside" actions found to be "arbitrary, capricious . . . or otherwise not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2).

Here again, the Court does not write on a blank slate. Several other courts in this District have held that the Department of State cannot rely on proclamations issued pursuant to 8 U.S.C. § 1182(f) to deny visa applications. *See, e.g.*, *Rai*, 567 F. Supp. 3d at 194; *Filazapovich*, 560 F. Supp. 3d at 233–35; *Milligan*, 502 F. Supp. 3d at 314–16; *Gomez I*, 485 F. Supp. 3d at 191–94. Today, this Court joins that chorus.

The Court starts with the "basic distinction between admissibility determinations and visa issuance that runs throughout the INA." *Trump*, 585 U.S. at 694. "The Act is rife with examples distinguishing between the two concepts." *Id.* at 694 n.3 (listing examples). Not every visa holder may enter the United States. *See* 8 U.S.C. § 1201(h) (providing that any noncitizens "to whom a visa . . . has been issued" may not "be admitted" into the United States if "he is found to be inadmissible"). And vice versa, not every inadmissible individual is necessarily ineligible for a visa. *See, e.g.*, *id.* § 1182(k) (providing the Attorney General with discretion to waive certain

inadmissibility conditions for individuals "in possession of an immigrant visa"). In other words, the INA does not "interchangeably" use "[t]he concepts of entry and admission" on the one hand and "issuance of a visa" on the other. *Trump*, 585 U.S. at 695 n.4.

That background informs the Court's reading of 8 U.S.C. § 1182(f), the statutory authority on which the President relied in issuing Proclamation 10949. That provision authorizes the President, subject to specified limitations, to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Plain as day, Subsection 1182(f) addresses only the question of entry, not the issuance of visas. No doubt that is why Proclamation 10949 itself only speaks to admissibility. The Proclamation declares that the President "determined to fully [or partially] restrict and limit the *entry* of nationals" of specified countries. 90 Fed. Reg. at 24499 (emphasis added).

Despite the clarity of this language, the Defendants take the position that "[t]he INA *requires* consular officers to refuse visas to aliens subject to an entry suspension under § 1182(f)." Defs.' Opp'n at 18 (emphasis added). Their support for that proposition is 8 U.S.C. § 1201(g), which states that "[n]o visa . . . shall be issued to an alien if . . . it appears to the consular officer . . . that such alien is ineligible to receive a visa . . . under section 1182 of this title, or any other provision of law." The Defendants reason that because Subsection 1182(f) is "part of section 1182," Section 1201(g) "prevents consular officers from issuing visas to aliens subject to a Proclamation suspending entry under § 1182(f)." Defs.' Opp'n at 18–19.

That exact argument has already been persuasively rejected by multiple courts in this District. As Judge Amit Mehta explained, "Subsection 1201(g) precludes the issuance of visas only as to persons who are 'ineligible to *receive a visa*' under Section 1182, not to persons who

are only ineligible *to enter* under that provision." *Gomez I*, 485 F. Supp. 3d at 191 (quoting

8 U.S.C. § 1201(g)).

> The categories of persons deemed ineligible to receive a visa pursuant to § 1201(g) appear in § 1182(a), not § 1182(f). Subsection 1182(a) provides that "aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States." Thus, a person who falls into one of the categories of inadmissible persons outlined in § 1182(a) is both ineligible to enter the country *and* ineligible to receive a visa pursuant to § 1201(g).

*Id.* at 191–92 (citation omitted). And Judge Mehta further explained that "[t]he reference to 'the

following paragraphs' in § 1182(a) does not include § 1182(f)." *Id.* at 192 (cleaned up). That is

because "Section 1182 of the INA carefully distinguishes between *subsections*, which include

§§ 1182(a) and 1182(f), and *paragraphs*, which are subunits of those subsections. Thus, 'the

following paragraphs' in § 1182(a) include only the ten paragraphs of § 1182(a); they do not also

include § 1182(f), a distinct subsection of § 1182." *Id.* Judge Mehta concluded that "[a] suspension

of entry under § 1182(f) therefore has no bearing on whether the person is 'inadmissible' under

§ 1182(a) or ineligible to receive a visa under § 1201(g)." *Id.* "The Court finds Judge Mehta's

interpretation persuasive and adopts it here." *See Milligan*, 502 F. Supp. 3d at 315 (Boasberg, J.)

(also adopting this analysis).

Perhaps recognizing the strength of this reasoning, the Defendants do not dispute it—or

even acknowledge it—in their brief. *See* Defs.' Opp'n at 18–21. Instead, the only other point they

make that even approaches a textual argument is the unelaborated assertion that the concepts of

"entry and issuance of visas" are "intertwined throughout the INA."[15] *Id.* at 18. They cite the

Supreme Court's description of Section 1182 in *Trump v. Hawaii*, where the Court said: "any alien

who is inadmissible under § 1182 (based on, for example, health risks, criminal history, or foreign

policy consequences) is screened out as 'ineligible to receive a visa.'"[16] *Trump*, 585 U.S. at 695

(quoting 8 U.S.C. § 1201(g)); Defs.' Opp'n at 19. But notably, all the examples the Court listed

are in Subsection 1182*(a)*, which expressly provides that its categories for inadmissibility also

render noncitizens ineligible to receive a visa. *See* 8 U.S.C. § 1182(a)(1) ("Health-related

---

[15] Although 8 U.S.C. § 1201(g) is the only statutory provision the Defendants rely on in their brief, *see* Defs.' Opp'n at 18–21, at oral argument the Defendants also alluded to a portion of the 1994 Foreign Relations Authorization Act, Pub. L. No. 103–236, § 140(c), 108 Stat. 382, 399–400 (1994), *as amended*, Pub. L. No. 103–415, § 1(d), 108 Stat. 4299, 4299 (1994) (codified at 8 U.S.C. § 1182 note), Motions Hr'g (Aug. 15, 2025), Rough Tr. at 49:1–9. The relevant provision states that "whenever a United States consular officer issues a visa for admission to the United States, that official shall certify, in writing, that a check of the Automated Visa Lookout System, or any other system or list which maintains information about the excludability of aliens under this chapter, has been made and that there is no basis under such system for the exclusion of such alien." § 140(c)(1)(A), 108 Stat. at 400. Without anything in the record before the Court about what information is contained in the Automated Visa Lookout System—or indeed, more saliently, what Congress understood was included in that System—the Court concludes that this provision does not undercut the Plaintiffs' likelihood of success on the merits. *See Gomez v. Biden* (*Gomez III*), No. 20-cv-1419, 2021 WL 3663535, at *14 (D.D.C. Aug. 17, 2021) (similarly declining to rely on this provision in the absence of (1) record evidence "that any Plaintiff's name was entered into" the System and (2) information about "what consequences follow from a consular officer's issuance of a visa to an individual listed in the system"), *rev'd on other grounds*, *Goodluck*, 104 F.4th 920.

[16] Similarly, the Defendants also cite a sentence from the background section in *Kerry v. Din*, 576 U.S. 86 (2015). There, the Court stated: "Before issuing a visa, a consular officer must ensure the alien is not inadmissible under any provision of the INA." *Id.* at 89. But the provision cited by the Court as support for that proposition, 8 U.S.C. § 1361, states only that when a person "makes application for a visa . . . *or* makes application for admission . . . , the burden of proof shall be on such person to establish that he is eligible to receive such visa . . . *or* is not inadmissible under any provision of this chapter." 8 U.S.C. § 1361 (emphases added). Section 1361 stands for the unremarkable proposition that applicants for visas must show their eligibility for a visa, and applicants for admission must show their admissibility. This Court understands the *Kerry* Court to have been relying on the fact that most grounds of inadmissibility also render a noncitizen ineligible to get a visa. *See* 8 U.S.C. § 1182(a).

grounds"), (a)(2) ("Criminal and related grounds"), (a)(3)(C) ("Foreign policy"). Regardless, the Court's statement is far too thin a reed to support the idea that inadmissibility and visa eligibility are so intertwined that they are occasionally interchangeable—especially given that literally two sentences before the one the Defendants invoke, the Court explained that there is a "basic distinction" between admissibility and visa eligibility "throughout the INA." *Trump*, 585 U.S. at 694; *id.* at 695 n.4. (explaining that the INA does not "interchangeably" use "[t]he concepts of entry and admission" and "issuance of a visa"). The Court disagrees with the Defendants that statutory references to prohibitions on entry may sometimes be transmuted into visa ineligibility.

Turning away from the text of any statute, the Defendants ask the Court to defer to the Department of State's "longstanding practice" of refusing visas to noncitizens "who are barred from entering the United States by a presidential action under § 1182(f)." Defs.' Opp'n at 19. And if it were true, as the Defendants assert, that the Department's understanding of Subsection 1182(f) "has been recognized and repeatedly endorsed by Congress over a period of many years and multiple enactments," the Court would be all ears. *Id.* But the Defendants saying it does not make it so—it just highlights the lacuna in the Defendants' brief where one might expect to find citations. Thus, "[g]iven the clarity of [Sub]section 1182(f) . . . , this Court finds no basis to defer to [the Department of State]'s practice, however well established it may be." *Milligan*, 502 F. Supp. 3d at 315; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).

Finally, the Defendants argue that the Court's reading of Subsection 1182(f) "would produce absurd practical consequences." Defs.' Opp'n at 20. It would be absurd, the Defendants claim, to permit consular officers to issue visas despite the applicant being unable to enter the United States. *Id.* at 21. The Defendants further raise the specter of "the unintended entry of inadmissible aliens, or at the very least confusion and administrative burdens." *Id.* Although the

Court is sensitive to these concerns, they are, at bottom, policy concerns. And "'even the most formidable' policy arguments cannot 'overcome'" clear statutory text. *B.P. P.L.C. v. Mayor and City Council of Balt.*, 593 U.S. 230, 245 (2021) (quoting *Kloeckner v. Solis*, 568 U.S. 41, 56 n.4 (2012)). More generally, "[i]t is not [the Court's] place to question whether Congress adopted the wisest or most workable policy, only to discern and apply the policy it did adopt." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022). If the Defendants think "good governance requires a different set of rules, its appeals are better directed to those who make the laws than those charged with following them." *Id.*

The Court, therefore, is left reviewing Department of State guidance documents that claim that visa denials are mandatory under 8 U.S.C. § 1182(f) despite that statute appearing to say no such thing. Accordingly, the Plaintiffs have met their burden of showing that the Department of State's Subsection 1182(f) guidance is "not in accordance with law" and "in excess of statutory . . . authority." *See* 5 U.S.C. § 706(2).

*     *     *

Taking a step back, the Court concludes that some of the Plaintiffs have shown a likelihood of success on the merits while others have not. The Denied Plaintiffs have failed to demonstrate that they will likely overcome the doctrine of consular non-reviewability. But the Administrative-Processing Plaintiffs have established that they are likely to prevail on their claims (1) that the Defendants have unreasonably delayed adjudicating their applications, and (2) that the Department of State's guidance relating to 8 U.S.C. § 1182(f) is unlawful. The Court next turns to the other preliminary injunction factors.

### B.    Irreparable Harm

In addition to showing a likelihood of success on the merits, a party seeking a preliminary injunction must show that, without relief, it will suffer irreparable harm. The injury "must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up).

This Court "has little trouble concluding that the . . . Plaintiffs have established irreparable harm." *Filazapovich*, 560 F. Supp. 3d at 244. The Plaintiffs "have provided a mountain of affidavits attesting to the severe emotional, economic, educational, and personal harms that they and their families will imminently experience if Defendants' actions are not enjoined [before] September 30, 202[5], and they permanently lose their opportunity to immigrate to the United States through the diversity visa program." *Gomez I*, 485 F. Supp. 3d at 200; *see, e.g.*, Decl. of Maysam Mahboubmojaz at ¶ 10 (describing the applicant's separation from his wife); Decl. of Mehdi Sojoudi Kelishami at ¶ 8–12 (describing the applicant giving up his job, closing his business, and being separated from his wife and daughter); Decl. of Koffi Fabrice Djondo at ¶¶ 19–24 (describing impact on the applicant's educational opportunities). Indeed, several courts in this District have found that situations nearly identical to this one present irreparable harm. *See, e.g.*, *Rai*, 567 F. Supp. 3d at 201; *Filazapovich*, 560 F. Supp. 3d at 244; *Milligan*, 502 F. Supp. 3d at 320; *Gomez I*, 485 F. Supp. 3d at 200.

The Defendants think there is no point in adjudicating the Plaintiffs' applications if the Plaintiffs cannot immigrate to the United States. *See* Defs.' Opp'n at 42. They say that the status quo would not harm the Plaintiffs, even when the Plaintiffs' diversity-visa opportunity expires on September 30. *See id.* And they emphasize that even if the Plaintiffs have their visa applications

approved, a "visa is not a right to admission" and they will remain inadmissible pursuant to Proclamation 10949. *See id.* at 42–43. Shockingly, the Defendants also suggest that the Plaintiffs' harm is not irreparable because they could "apply next year" and "win the lottery" again. *Id.* at 42.

But the Defendants miss the gravity of what the Plaintiffs stand to lose. The Plaintiffs literally won the lottery; they were randomly selected from millions of people around the world hoping for one of a handful of visas that could give them a chance to immigrate to the United States. *See Gomez I*, 485 F. Supp. 3d at 159. It may well be that, because of circumstances outside of their control, they will ultimately be unable to enter the United States even if they get a visa. But all the Plaintiffs are asking for is an answer on their applications, and one that is given lawfully. It would be callous indeed to dismiss the irreparable harm these Plaintiffs would suffer if the Department of State lets their once-in-a-lifetime opportunity expire.

## C.    Balance of Equities and Public Interest

"The last factors, which the Court considers together, examine 'the balance of equities' and 'the public interest,'" and these factors merge when the non-moving party is the Government. *Milligan*, 502 F. Supp. 3d at 321 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). These factors also favor relief. "If the court does not grant preliminary relief now, there is a strong likelihood that these Plaintiffs will lose any opportunity for permanent relief later. These drastic harms heavily favor preliminary relief." *Gomez I*, 485 F. Supp. 3d at 200. "[A]nd even for those Plaintiffs whose visas are ultimately denied, knowledge of the decision will allow them to more concretely plan their futures." *Milligan*, 502 F. Supp. 3d at 321. Further "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

The Defendants complain about the administrative difficulty for the Government "to issue visas to some individuals but then have to determine that they cannot enter the United States at a port of entry." Defs.' Opp'n at 43–44. "But this alleged problem is neither new to immigration officers nor unique to this Court's understanding of [Sub]section 1182(f)." *Milligan*, 502 F. Supp. 3d at 320 at 321. No visa guarantees admission, they only give an individual "permission to arrive at a port of entry and have an immigration officer independently examine the alien's eligibility for admission." *Goodluck*, 104 F.4th at 922 (quoting *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999)). The Government suffers little harm in continuing to trust its immigration officers with independently examining the admissibility of all potential entrants, visa holders or otherwise.

The Defendants further suggest that it would not serve the public interest to push the Plaintiffs to the front of the adjudicatory queue at a cost to other DV-2025 applicants. Defs.' Opp'n at 43–44. But as the Court discussed above, the Defendants have offered nothing other than mere assertions to support the contention that granting relief to these Plaintiffs will mean that other applicants will not have their applications adjudicated. And finally, the Defendants argue that granting the Plaintiffs relief "would interfere in the Executive Branch's foreign affairs and national security activities." Defs.' Opp'n at 44. These are interests that the Court takes seriously. Yet, the only relief the Court will grant in this case is to require the Department of State to adjudicate the Plaintiffs' applications subject to the same standards—with the exception of Subsection 1182(f)— it uses in every other case. Balancing these interests together, the Court concludes that they support a preliminary injunction.

### REMEDY

Under the APA, a court "may issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. This includes "the power to compel agency inaction when necessary 'to preserve status or rights.'" *Gomez I*, 485 F. Supp. 3d at 203. And more generally, "[a]n injunction 'is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *Rai*, 567 F. Supp. 3d at 202 (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017)). It must also "be narrowly tailored to remedy the specific harm shown." *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (quoting *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)). Still, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties.'" *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025) (emphasis omitted) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).

Here, the harms for which the Plaintiffs have met their preliminary-injunction burdens are (1) the Administrative-Processing Plaintiffs' applications remaining unadjudicated pending administrative processing, and (2) the application of the Department of State's likely unlawful guidance concerning the effect of 8 U.S.C. § 1182(f) proclamations on visa applications. The relief the Court orders is twofold: First, the Secretary of State shall undertake good-faith efforts, directly and through his designees, to expeditiously process and adjudicate the Plaintiffs' applications that are currently in administrative processing by September 30, 2025. Second, in processing and adjudicating the relevant Plaintiffs' applications, the Secretary of State, directly and through his designees, is preliminarily enjoined from issuing visa-application refusals based on 8 U.S.C.

§ 1182(f), Proclamation 10949, or any guidance instructing consular officers to refuse visas based on Subsection 1182(f).

Finally, the Court pauses to make clear what it is *not* ordering. The Court denies any relief to the Denied Plaintiffs, by which the Court means any of the Plaintiffs whose visa applications have been refused without further administrative processing. Further, "[t]he Court . . . takes no position on whether the Defendants <u>must issue</u> visas to each Plaintiff named in this suit. Nor does it decide whether other provisions of the INA, not briefed in this case, enable [the State Department] to deny visas or suspend their issuances." *Milligan*, 502 F. Supp. 3d at 316. The relief the Court grants today is directed only to ensure that the Plaintiffs get adjudications that settle their applications as required by 8 U.S.C. § 1202(b), and that those adjudications do not rely on the Department of State's likely unlawful interpretation of 8 U.S.C. § 1182(f).

The Court further orders the Defendants to file a status report by August 28, 2025, and another every seven days thereafter, that updates the Court on how many of the Plaintiffs' applications have been adjudicated and how many remain to be adjudicated. Finally, the Plaintiffs are ordered to post collectively a bond in the amount of $1.00. *See* Fed. R. Civ. P. 65(c); *see Am. Oversight v. Hegseth*, No. 25-cv-883, 2025 WL 1721995, at *12 (D.D.C. June 20, 2025).

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Plaintiffs'

Motion for Preliminary Injunction, ECF No. 11.

A separate order will issue.

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   August 21, 2025